*Terminiello v. City of Chicago,* 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949).

Indeed, it is provocative and challenging speech, like Beussink's, which is most in need of the protections of the First Amendment. Popular speech is not likely to provoke censure. It is unpopular speech that invites censure. It is unpopular speech which needs the protection of the First Amendment. The First Amendment was designed for this very purpose.

Speech within the school that substantially interferes with school discipline may be limited. Individual student speech which is unpopular but does not substantially interfere with school discipline is entitled to protection.

The public interest is not only served by allowing Beussink's message to be free from censure, but also by giving the students at Woodland High School this opportunity to see the protections of the United States Constitution and the Bill of Rights at work.

### III. Conclusion

When placed in the context of the four *Dataphase* factors, the evidence presented at the preliminary injunction hearing weighs in favor of issuing the preliminary injunctive relief sought by Beussink. Woodland School District will be enjoined from using the ten day suspension in its application of its absenteeism policy to Beussink's grades for the second semester of his junior year. Further the Woodland School District will be enjoined from enforcing any other sanction arising from Beussink's homepage which is the subject of this lawsuit. Finally, the Woodland School District will be enjoined from restricting Beussink's use of his home computer to repost that homepage.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiff's request for preliminary injunctive relief is **GRANTED.** Defendant is hereby enjoined from using the ten day suspension, which is the subject of this lawsuit, in its application of the school's absenteeism policy to Beussink's grades for the second semester of Beussink's junior year. Further the

Woodland School District will be enjoined from enforcing any other sanction arising from Beussink's homepage, which is the subject of this lawsuit. Finally, the Woodland School District is enjoined from restricting Beussink's use of his home computer to repost that homepage.

**MEDICAL LABORATORY MANAGEMENT CONSULTANTS d/b/a Consultants Medical Lab, et al., Plaintiffs,**

v.

**AMERICAN BROADCASTING COMPANIES, INC., et al., Defendants.**

**No. Civ 95–02494–PHX–ROS.**

United States District Court, D. Arizona.

Dec. 22, 1998

Neville Lawrence Johnson, Neville L. Johnson & Associates, Los Angeles, CA, Brian A. Rishwain, Law Offices of Brian A. Rishwain, Los Angeles, CA, for Medical Laboratory Management Consultants, John Devaraj, Carolyn Devaraj.

Andrew D. Hurwitz, Diane M. Johnsen, Osborn Maledon PA, Phoenix, AZ, for Diane Sawyer, Ira Rosen, Robbie Gordon, Mark Lukazsiewicz, Executive Producer Defendant No. 1, Program and Practices Defendant No. 2, Hidden Camera Defendants 3–6, David Shapinsky, Phyllis E. McGrady, Richard C. Wald, Jeff Cooke.

## AMENDED ORDER

SILVER, District Judge.

## FACTUAL BACKGROUND

This action arises from a broadcast on American Broadcasting Companies ("ABC")'s television program *Prime Time Live* about faulty pap smear testing. On or about February 10, 1994, Defendant Robbie Gordon, an employee of Defendant ABC, telephoned Plaintiff John Devaraj, a co-owner with his wife, Carolyn Devaraj, of Medical Laboratory Consultants (d/b/a Consultants Medical Lab) (hereinafter "Medical Lab"). Ms. Gordon, who had no prior contact with Mr. Devaraj, told him that she was a cytotechnologist[1] from Georgia interested in starting a pap smear laboratory in that state and "wanted to find out more details on the costs involved ... and the financial end of running such a lab." (Pls.['] Resp. to Defs.['] First Set of Interrogs., No.1, attached to Defs['] Statement of Facts ("DSOF") as Exh. A.) She informed Mr. Devaraj that she would be in Phoenix visiting friends or relatives and asked if she could visit his laboratory to learn more about the industry. (*Id.*) Mr. Devaraj claims that he asked Ms. Gordon "a few questions such as 'Who are you?' [and] 'Do you have enough funds available?'" (Devaraj Dep. at 91, attached to DSOF as Exh. B.) Mr. Devaraj agreed to schedule a meeting with Ms. Gordon at Medical Lab because it "appeared to be that she would be willing to bring some business to [his] laboratory." (*Id.* at 92.) In fact, Ms. Gordon was not a cytotechnologist and her only interest in Medical Lab was as a possible source of information for an upcoming episode of *Prime Time Live* concerning error rates in pap smear testing conducted by medical laboratories.

The meeting took place at Medical Lab on March 18, 1994. Ms. Gordon was accompanied by Jeff Cooke—who claimed he was a computer expert but was an undercover camera specialist—and another individual whose name has not been revealed. (*Id.* at 212.) Ms. Gordon and Mr. Cooke entered the laboratory through an unlocked door leading into a reception room. (*Id.* at 213, 215.) Mr. Devaraj met them there and escorted them to a conference room adjoining the reception area. (*Id.* at 215.) The conference room had windowed French doors and was visible by an accounting clerk who was working on the other side of the door. (*Id.* at 216.)

During roughly two hours, they spoke generally about the laboratory industry, about Medical Lab in particular, and about Ms. Gordon's fictitious plans to open a laboratory. Mr. Devaraj told them that Medical Lab tried to compete with larger labs by offering a "better turnaround time." (*Id.* at 214; DSOF at ¶ 4.) In addition, Mr. Devaraj invited Ms. Gordon and Mr. Cook on a tour of the laboratory, an invitation he occasionally made to prospective customers, physicians, and others who had "proper identification." (*Id.* at 212, 220.) At one point during the tour, Ms. Gordon appeared to be heading into Mr. Devaraj's office and was asked not to go

---

1. A cytotechnologist is a medical laboratory technologist who examines cells under a pathologist's supervision in order to diagnose cancer or other diseases.

there. (*Id.* at 221.) This was the only occasion during the visit when Ms. Gordon or Mr. Cooke were told not to enter a particular area. (*Id.*) Medical Lab employees were present for portions of the conversation during the tour. (Gordon Dep. at 14, attached to DSOF as Exh. C; Cooke Dep. at 45, attached to DSOF as Exh. E; Tiffany Splittorff Dep. at 37, attached to DSOF as Exh. G.) At no point during the interview did Mr. Devaraj ask that they keep any of the information discussed confidential. (Tr. of 3/18/94 Interview, attached to DSOF as Exh. D.) As many as 20 or more patients visited Medical Lab each day for blood work and other laboratory tests, but the conference room where the interview took place was located in an adjoining suite used for administrative purposes. (Hermosillo Dep. at 15–16, attached to DSOF as Exh. L; Devaraj Dep. at 213, attached to DSOF as Exh. B.)

Unbeknownst to Plaintiffs, Mr. Cooke filmed the entire episode with hidden cameras located in his wig. (Cooke Dep. at 14–15, attached to DSOF as Exh. E.) ABC featured footage from the interview on a broadcast designed to highlight what it perceived were frequent errors in pap smear testing at medical laboratories. Also as part of preparation for the broadcast, Defendants sent pretested pap smear slides to Medical Lab for testing, claiming the slides were from patients at a fictitious clinic called the Huron Women's Health Collective. When the program, which was titled *Rush to Read,* aired on May 19, 1994, it was reported that Medical Lab mistakenly failed to identify cervical cancer on several of the slides. *Rush to Read* did not identify Mr. Devaraj and Medical Lab by name but a picture of his face was published during the broadcast.

John and Carolyn Devaraj and Medical Lab ("Plaintiffs")[2] sued ABC, KTVK–TV (ABC's then-affiliate in Phoenix) and other individuals ("Defendants") allegedly involved in the production of *Rush to Read* after it aired. In an Order dated April 25, 1996, the Court dismissed all of Plaintiffs' claims against KTVK–TV and the public disclosure of private facts, intentional infliction of emotional distress, unfair practices, trade libel, negligent infliction of emotional distress, and conspiracy claims against the remaining Defendants.[3] Defendants now move for summary judgment on the remaining claims of intrusion, fraud, interference with contractual relations, trespass, eavesdropping, and punitive damages. Defendants Lorri Garcia–Cottrell and Rhondi Charleston independently move for summary judgment on all the claims against them. In addition, Plaintiffs have filed a Motion for an Order Granting Leave to File a Second Amended Complaint to Add Claims for Defamation & False Light to Conform to Proof. The motion for summary judgment raises a panoply of issues which have conflicted many courts for two reasons. First, it requires grappling with and finding a balance between two fervently protected fundamental rights in competition: the right of the individual to be left alone and the right of society to access information of public interest. Second, it involves a difficult analysis of common law causes of action enshrouded by the First Amendment.

### LEGAL DISCUSSION

Fed.R.Civ.P. 56(c) authorizes the granting of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Judgment for the moving party must be entered "if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "If reasonable minds could differ as to the import of the evidence," judgment should not be entered in favor of the moving party. *Id.* at 250–251, 106 S.Ct. 2505.

The moving party bears the initial burden of identifying the elements of the claim in the pleadings, depositions, answers to the interrogatories, affidavits, and other evidence,

---

**2.** John and Carolyn Devaraj are Medical Lab's sole shareholders.

**3.** Plaintiffs agreed to the dismissal of the conspiracy, negligent infliction of emotional distress, trade libel, and unfair business practices claims against all the Defendants. *Matter of Medical Laboratory Management Consultants,* 931 F.Supp. 1487, 1494 (D.Ariz.1996).

which the moving party "believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1305–06 (9th Cir.1982). The burden then shifts to the non-moving party to establish that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. More than a "metaphysical doubt" is required to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The parties bear the same substantive burdens of proof as would apply at a trial on the merits. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. In a summary judgment motion, the Court does not weigh the evidence or the credibility of witnesses, rather "the nonmovant's version of any disputed issue of fact is presumed correct." *Eastman Kodak Co. v. Image Technical Serv., Inc.*, 504 U.S. 451, 458, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992).

## I. Intrusion

■ Plaintiffs' first claim for relief is that Defendants invaded Mr. Devaraj's privacy by using false pretenses to gain entrance to Medical Lab and by secretly videotaping the conversation.[4] Arizona recognizes the four branches of the tort of invasion of privacy outlined in the Restatement: 1) intrusion on seclusion; 2) commercial appropriation; 3) publication of private facts; and 4) false light.[5] *Rest. (Second) of Torts* § 652A (1977); *Godbehere v. Phoenix Newspapers, Inc.*, 162 Ariz. 335, 783 P.2d 781, 784 (Ariz. 1989) (citing *Rest.* § 652A–I); *Hart v. Seven Resorts Inc.*, 190 Ariz. 272, 947 P.2d 846, 853 (Ariz.App.1997); Mary Jo Rudd, Note, *Is Invasion of Privacy A Viable Action in Ari-*

*zona?: Rethinking the Standard*, 30 Ariz. L.Rev. 322–24 (1988). The Restatement describes the tort of intrusion upon seclusion as follows: "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of privacy, if the intrusion would be highly offensive to a reasonable person." *Hart*, 947 P.2d at 853 (quoting *Rest.* § 652B).[6]

### A. The Intrusive Act

■ To prevail on an intrusion claim, a plaintiff must first show that the defendant "has intruded into a private place, or has otherwise invaded a private seclusion that the plaintiff has thrown about his person or affairs." *Rest.* § 652B, cmt. c; *Shulman v. Group W. Productions, Inc.*, 18 Cal.4th 200, 74 Cal.Rptr.2d 843, 864, 955 P.2d 469 (Cal. 1998) (to recover for intrusion, plaintiff must show that "defendant penetrated some zone of physical or sensory privacy surrounding, or obtained unwanted access to data about, the plaintiff.") The Restatement states:

> The invasion may be by physical intrusion into a place in which the plaintiff has secluded himself, as when the defendant forces his way into the plaintiff's room in a hotel or insists over the plaintiff's objection in entering his home. *It may also be by the use of the defendant's senses, with or without mechanical aids, to oversee or overhear the plaintiff's private affairs, as by looking into his upstairs window with binoculars or tapping his telephone wires.* It may be by some other form of investigation or examination into his private concerns, as by opening his private and personal mail, searching his safe or wallet, examining his private bank account, or compelling him by a forged court order to permit an inspection of his personal documents.

---

4. This claim is being brought by John Devaraj alone, not by Medical Lab or Carolyn Devaraj.

5. On March 31, 1998, the Court dismissed Plaintiffs' false light claim and refused to allow Plaintiffs to amend their complaint to include a claim of public disclosure of private facts. (Order, March 31, 1998.)

6. No reported Arizona cases address the issue of whether a secret video taping conducted by a

member of the media in a workplace setting constitutes an intrusion on seclusion. In the absence of contrary Arizona case law, Arizona courts are bound to follow the Restatement. *MacNeil v. Perkins*, 84 Ariz. 74, 324 P.2d 211, 215 (1958); *Creative Learning Systems, Inc. v. State*, 166 Ariz. 63, 800 P.2d 50, 52 (Ariz.App. 1990).

*Hart,* 947 P.2d at 853 (quoting *Rest.* § 652B, cmt. b) (emphasis added). Regardless of the method of intrusion used, a plaintiff can recover "only if he had an *objectively reasonable expectation* of seclusion or solitude in the place, conversation, or data source." *Shulman,* 74 Cal.Rptr.2d at 864, 955 P.2d 469; *Kemp v.Block,* 607 F.Supp. 1262, 1264 (D.Nev.1985) (emphasis added); *People for the Ethical Treatment of Animals v. Bobby Berosini, Ltd.,* 111 Nev. 615, 895 P.2d 1269, 1279 (Nev.1995).

When an intrusion occurs in a home or other personal sphere, the plaintiff's expectation of privacy has, in most instances, been deemed to be objectively reasonable. *Dietemann v. Time, Inc.,* 449 F.2d 245, 249 (9th Cir.1971) ("Plaintiff's den was a sphere from which he could reasonably expect to exclude eavesdropping newsmen."). However, courts have recognized that there is a diminished expectation of privacy in the workplace. *See, e.g., Ali v. Douglas Cable Communications,* 929 F.Supp. 1362, 1382 (D.Kan.1996); *People for the Ethical Treatment of Animals,* 895 P.2d at 1281 ("there is, generally speaking, a reduced objective expectation of privacy in the workplace."); *Hart,* 947 P.2d at 853 (rejecting employees' intrusion upon seclusion claims against their employer's demand that they take a drug test); *Cox v. Hatch,* 761 P.2d 556, 563 (Utah 1988) (no reasonable expectation of privacy in a "common workplace"). When courts have considered claims in the workplace, they have generally found for the plaintiffs only if the challenged intrusions involved information or activities of a highly intimate nature. *Borse v. Piece Goods Shop, Inc.,* 963 F.2d 611, 621 (3rd Cir.1992) (noting that "[i]f the method used [by an employer] to collect [a] urine sample fails to give due regard to the employee's privacy, it could constitute a substantial and highly offensive intrusion upon seclusion" and that the same principles would apply to an employer's search of an employee's personal property "if it is done in such a way as to reveal *personal matters unrelated to the workplace* ") (relying on *Rest.* § 652B) (emphasis added); *Doe v. Kohn Nast & Graf, P.C.,* 862 F.Supp. 1310, 1326 (E.D.Pa.1994) (summary judgment denied on employee's claim that employer intruded on his seclusion

by searching through and reading personal medical documents on an employee's desk) (relying on *Rest.* § 652B). Where the intrusions have merely involved unwanted access to data or activities related to the workplace, however, claims of intrusion have failed. *See, e.g, Smith v. Colorado Interstate Gas Co.,* 777 F.Supp. 854, 857 (D.Colo.1991) ("Unreasonable intrusion of seclusion is not implicated because the allegations [that plaintiff's former employer intruded on her seclusion by informing a prospective employer that she had not been laid off, as she claimed on a job application] do not involve invasions of [plaintiff's] personal solitude or personal affairs") (citing *Rest.* § 652B); *Bratt v. International Business Machines Corp., et al.,* 785 F.2d 352, 359 (1st Cir.1986) (finding that "no reasonable fact finder could conclude that there had been an unreasonable intrusion" upon the plaintiff's privacy by the limited dissemination of the frequent use by the employee of the employer's confidential grievance process because "[t]he information itself, although it may have had a negative connotation to some managers, is not of such a personal nature that an intrusion upon privacy results from its disclosure."); *Hastings & Sons Pub. Co. v. City Treasurer,* 374 Mass. 812, 375 N.E.2d 299, 303 (Mass.1978) (no breach of privacy in disclosure of payroll records because information did not include " 'intimate details' of a 'highly personal' nature"); *Ali,* 929 F.Supp. at 1382 (plaintiffs could only prevail on intrusion claim against their employer's monitoring or recording of their telephone conversations at work if such calls were of a "personal nature").

In the instant case, Mr. Devaraj invited Ms. Gordon and Mr. Cooke to his place of business for a meeting. Regardless of whether they were potential future business partners, as Mr. Devaraj thought, Ms. Gordon and Mr. Cooke were strangers who chose Mr. Devaraj from relative obscurity and called him. The conversation and office tour took place in a laboratory that was at least partially open to the public and was accessible to employees. Mr. Devaraj did not communicate to the Defendants that he expected the conversation would not be disclosed to others, nor did he take any precautions to ensure that the contents of the discussion remained confidential. Furthermore,

over the course of the roughly two hours, the topics of conversation were restricted to discussions of the industry as a whole and to the general practices at Medical Lab. For instance, Mr. Devaraj told Ms. Gordon and Mr. Cooke that he paid his cytotechnologists more than other labs so they preferred to work for him, that he had better turnaround time than other labs, and that he made only a minimal profit on the pap smear testing. (Devaraj Decl. at ¶ 9, attached to Pls.['] Statement of Facts ("PSOF") as Exh. 8.) Mr. Devaraj freely shared this information with Ms. Gordon and Mr. Cooke and may not have if he knew they were recording his conversation for publication. The information, however, hardly constituted matters involving "intimate personal facts." *Desnick v. American Broadcasting Companies, Inc.*, 44 F.3d 1345, 1353 (7th Cir.1995). Thus, Mr. Devaraj can claim no reasonable expectation of privacy in the location or contents of the conversation. *Shulman*, 74 Cal.Rptr.2d at 864, 955 P.2d 469.

### B. The Level of Offensiveness of the Intrusion

The second element of a claim of intrusion upon seclusion is that the intrusion must be found to be "highly offensive to a reasonable person." *Rest.* § 652B. Arizona cases offer little guidance regarding the type of conduct that would constitute a "highly offensive" intrusion.[7] In 1989, the Arizona Supreme Court considered the "extreme and outrageous conduct" standard that had defined the level of offensiveness then required for an intrusion or other invasion of privacy claim: *Godbehere*, 783 P.2d at 785. Noting that the existing standard required plaintiffs to prove the elements of intentional infliction of emotional distress in addition to proving invasion of privacy, the Court rejected the "extreme and outrageous conduct" standard in favor of the "highly offensive" standard set forth in

the Restatement and adopted by most jurisdictions. *Id.* In the decade since *Godbehere*, there has been only one reported case involving an intrusion claim in Arizona and it fails to discuss the "highly offensive" standard. *Hart*, 947 P.2d at 853 (rejecting claim of intrusion based on an employer's demand that employees submit to a drug test). Thus, while it is clear that the level of injury required for intrusion in Arizona falls short of what would be required to state a claim for intentional infliction of emotional distress, Arizona cases do not illuminate the precise standard.

However, the Restatement's examples of intrusion offer some insight into the parameters of the "highly offensive" standard. In one example, a reporter asks a woman hospitalized with a "rare disease that arouses public curiosity" for an interview. *Rest.* § 652B, cmt b., illus. 1. Ignoring her refusal, the reporter goes to the hospital and takes her photograph over her objection. *Id.* In another, a private detective uses a telescope to look into someone's upstairs bedroom window for two weeks and takes "intimate pictures" with a telescopic lens. *Id.* at illus. 2. These examples suggest that, while the "highly offensive" standard may require less than "extreme and outrageous conduct," it is reserved for truly exceptional cases of intrusion.

Cases from other states also address the "highly offensive" standard of the Restatement. Offensiveness is determined by considering " 'the degree of the intrusion, the context, conduct and circumstances surrounding the intrusion as well as the intruder's motives and objectives, the setting into which he intrudes, and the expectations of those whose privacy is invaded.' " *Deteresa v. American Broadcasting Companies, Inc.*, 121 F.3d 460, 465 (9th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1840, 140 L.Ed.2d 1090 (1998) (quoting *Hill v. Nation-*

---

7. Although cases are scarce, there are early indications that Arizona courts recognize that the right to privacy should be balanced with other considerations under Arizona law. In the first Arizona case to recognize a right of privacy, the Arizona Supreme Court noted that the right to privacy:

does not exist if there has been a consent to publication, or where the plaintiff has become a public character, and thereby waived his

right to privacy, nor in the ordinary dissemination of news and events, nor in connection with the life of a person in whom the public has a rightful interest, nor where the information would be of public benefit.

*Reed v. Real Detective Pub. Co.*, 63 Ariz. 294, 162 P.2d 133, 138 (Ariz.1945) (a privacy claim brought challenging the publication of a photo and an alleged libelous statement).

al Collegiate Athletic Ass'n, 7 Cal.4th 1, 26 Cal.Rptr.2d 834, 865 , P.2d 633 (Cal.1994)); see also, Shulman, 74 Cal.Rptr.2d at 867, 955 P.2d 469; Wolfson v. Lewis, 924 F.Supp. 1413, 1421 (E.D.Pa.1996); People for the Ethical Treatment of Animals, 895 P.2d at 1281. The California Supreme Court recently considered these factors in a case involving an intrusion claim brought by an accident victim who was filmed without her permission at the accident scene and in the helicopter that transported her to the hospital. Shulman, 74 Cal.Rptr.2d at 863, 955 P.2d 469. The court noted that the *motivation* behind an intrusion "becomes particularly important when the intrusion is by a member of the print and broadcast press in the pursuit of news material." Id. at 867. Citing Cohen v. Cowles Media Co., 501 U.S. 663, 669, 111 S.Ct. 2513, 115 L.Ed.2d 586 (1991), the California Supreme Court noted the necessity of balancing privacy rights with freedom of the press:

> Although ... the First Amendment does not immunize the press from liability for torts or crimes committed in an effort to gather news, the constitutional protection of the press does reflect the strong societal interest in effective and complete reporting of events, an interest that may—as a matter of tort law—justify an intrusion that would otherwise be considered offensive. While refusing to recognize a broad privilege in newsgathering against application of generally applicable laws, the United States Supreme Court has also observed that 'without some protection for seeking out the news, freedom of the press could be eviscerated.'

Shulman, 74 Cal.Rptr.2d at 867, 955 P.2d 469, quoting Branzburg v. Hayes, 408 U.S. 665, 681, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). Thus, the public's interest in the news and the absence of less invasive methods of reporting the story may mitigate the offensiveness of the intrusion. "Information collecting techniques that may be highly offensive when done for socially unprotected reasons—for purposes of harassment, blackmail, or prurient curiosity, for example—may

not be offensive to a reasonable person when employed by journalists in pursuit of a socially or politically important story." Shulman, 74 Cal.Rptr.2d at 867, 955 P.2d 469.

It is worth emphasizing that this balancing test does not protect all newsgathering activities. As Shulman noted, the constitutional protection afforded newsgathering "if any, is far narrower than the protection surrounding the publication of truthful material." Shulman, 74 Cal.Rptr.2d at 870, 955 P.2d 469. Where the intrusion is gratuitous, threatens the safety of anyone involved, or unnecessarily intrudes on a target of the news in his private capacity, the offensiveness may be deemed greater. See, e.g, Id. (concluding that a jury could reasonably find that the presence of a cameraperson and hidden microphone in a helicopter ambulance was highly offensive); Miller v. National Broadcasting Co., 187 Cal.App.3d 1463, 232 Cal.Rptr. 668 (Cal.App.1986) (unauthorized entry of a television camera crew in a heart attack victim's bedroom could be classified as "highly offensive"); KOVR–TV, Inc. v. Superior Court 31 Cal.App.4th 1023, 37 Cal.Rptr.2d 431 (Cal.App.1995) (no newsgathering defense to claim of intentional infliction of emotional harm for television reporter who told small children that their neighbors had been killed so he could film their shocked reaction); Wolfson, 924 F.Supp. 1413, 1432 ("ambush" tactics of reporters, including "conduct apparently designed to hound, harass, intimidate and frighten" news targets was likely to constitute intrusion).

In the instant case, it is undisputed that Defendants were reporting on potential laboratory errors in testing of pap smears, information that was clearly in the public interest because the results of the tests involve vital health issues. See infra note 11 and accompanying text. As part of their newsgathering activities, they conducted a hidden camera interview with an owner of a laboratory that profits from conducting such tests. They did not jeopardize the safety of anyone, nor did they intrude on Mr. Devaraj's home or aspects of his private life.[8] While Mr. Devaraj may have preferred that the inter-

---

8. The instant case is distinguishable on these grounds from Dietemann, relied on by Plaintiffs. 449 F.2d at 245. In Dietemann, reporters went to the office of a "quack" doctor, which was in

his home. As the Seventh Circuit noted, distinguishing Dietemann from a hidden camera report on a medical clinic, Dietemann "was not in

view not be broadcast, the intrusion was not highly offensive as a matter of law. Because Defendants did not "intentionally intrude upon the seclusion of another or his private affairs or concerns," *Rest.* § 652B, and because the alleged intrusion was not "highly offensive," they are entitled to summary judgment on Plaintiffs' intrusion claim.

### C. Alternative Reasoning

■ Summary judgment is warranted on the intrusion claim on alternative grounds. According to the Restatement, "the intrusion itself makes the defendant subject to liability, even though there is no publication or other use of any kind of the photograph or information." § 652B. A number, if not most, jurisdictions interpreting § 652B have refused to consider the publication of information obtained during an alleged intrusion as a factor in determining the offensiveness of the act. The result is particularly significant in cases involving hidden cameras, where, as here, the intrusion itself may be minimal and the plaintiff's primary complaint is that the information gained from the intrusion was published. In *Russell v. American Broadcasting Company*, 1995 WL 330920, *8 (N.D.Ill.), for example, the court considered a claim of intrusion brought by the manager of a seafood retailer against a reporter who secured a job at plaintiff's store and wore a hidden camera to capture film footage that was broadcast on *Prime Time Live* concerning sanitation problems in the commercial fish industry. Relying, in part, on § 652B of the Restatement, the federal district court of the Northern District of Illinois noted:

> 'The basis of the tort [of intrusion] is not publication or publicity. Rather *the core of this tort is the offensive prying into the private domain of another.*' In the instant case, plaintiff alleges that defendants secretly recorded a conversation she willingly had with a co-worker at her place of business. This is hardly 'offensive prying into the private domain of another.' [Plaintiff] was harmed, if at all, by the

business, and did not advertise his services or charge for them. His quackery was private." *Desnick*, 44 F.3d at 1353.

**9.** Unlike some cases, in which media defendants are charged with ambushing a news target, either with harassing requests for information or

publication of her conversations with [the reporter], not by the filming itself. Therefore, she does not state a claim for intrusion upon seclusion.

*Id.* (citations omitted) (emphasis added). The Seventh Circuit applied similar reasoning to a claim of intrusion by a basketball player whose telephone conversation with a coach from a competing university was secretly recorded by the coach and publicized. Rejecting the basketball player's claim, the court held:

> The tort of intruding upon the seclusion of another is aimed at discomfort caused by the intrusion itself—for example, someone enters your bedroom, opens your mail, or makes repeated and unwanted telephone calls to you. Eavesdropping by wiretapping may itself constitute such an invasion of privacy. In this instance, however, [plaintiff] was harmed if at all not by the telephone calls themselves (since he was a willing party) or even by the recording, but by the publication of what he said in the conversations. And under [*Lovgren v. Citizens First National Bank of Princeton*, 126 Ill.2d 411, 128 Ill.Dec. 542, 534 N.E.2d 987 (Ill.1989) ], a plaintiff fails to state a claim for invaded seclusion if the harm flows from publication rather than intrusion.

*Thomas v. Pearl*, 998 F.2d 447, 452 (7th Cir.1993); *see also, Reuber v. Food Chemical News, Inc.*, 925 F.2d 703, 718 (4th Cir.1991) ("The intrusion prong of invasion of privacy requires a positive act by a defendant, aside from publication, that encroaches on a plaintiff's seclusion."); *Beard v. Akzona, Inc.*, 517 F.Supp. 128, 131 (E.D.Tenn.1981) ("Whether the information gained by reason of the intrusion was ever publicized is irrelevant to this form of invasion of privacy.") (citing *Rest.* § 652B); *Machleder v. Diaz*, 538 F.Supp. 1364, 1374 (S.D.N.Y.1982) ("the intrusion under consideration is not the publicizing of plaintiff's reaction to defendant's confrontation but rather the defendant's act of confrontation itself.").[9]

with physically aggressive behavior, there was nothing in Mr. Devaraj's interview with Ms. Gordon and Mr. Cooke that could be deemed "highly offensive" to human sensibilities. *See, e.g., People for the Ethical Treatment of Animals*, 895 P.2d at 1283 (concluding that animal rights group's secret videotaping of trainer's backstage

Thus, regardless of which legal basis is employed, Plaintiffs' intrusion claim does not survive summary judgment. Accordingly, Defendants' motion for summary judgment on Plaintiffs' claim of intrusion will be granted.

*II. Interference With Contractual Relations and Prospective Economic Relations*

*A. The Elements of the Cause of Action*

Plaintiffs allege that Defendants' production of *Rush to Read* prompted some of Plaintiffs' customers to take their laboratory business elsewhere, constituting tortious interference with Plaintiffs' contractual relations and prospective economic relations. Despite Plaintiffs' effort to claim otherwise, it is clear from the record, including a letter from Plaintiffs' own lost profits expert, that the injury to contractual relationships was caused, if at all, by the broadcast of *Rush to Read* rather than activities relating to the creation and preparation of the story. (Stamps Dep. at 50, 53, 71–73, attached to DSOF as Exh. P; Fara Dep. at 4–6, 11, attached to DSOF as Exh. Q; Letter from Pls.['] expert G. Christopher Davis to Pls.['] counsel, 8/29/97, attached to DSOF as Exh. S). As Defendants contend, this distinction is crucial. Because the alleged injury stems from a news broadcast, this Court must ensure that the First Amendment's requirements for constitutionally protected speech have been met.[10] *Unelko Corp. v. Rooney,* 912 F.2d 1049, 1058 (9th Cir.1990).

In *Unelko,* the Ninth Circuit considered claims of defamation, product disparagement, and tortious interference with business relationship against *60 Minutes* commentator Andy Rooney for broadcasting a disparaging reference regarding plaintiff's product. 912 F.2d at 1058. The Ninth Circuit disposed of plaintiff's defamation claim, noting that because the issue was a matter of public concern, the plaintiff was required to show that the broadcast was not substantially true, which he failed to do. *Id.* at 1057. Significantly, the Ninth Circuit also disposed of plaintiff's product disparagement and tortious interference with business relationships claims on concomitant grounds, concluding that when such claims are brought as a result of constitutionally protected speech, they are "subject to the same first amendment requirements that govern actions for defamation." *Id.* at 1058; *see also, Redco Corp. v. CBS, Inc.,* 758 F.2d 970, 973 (3rd Cir.1985) (unless defendants "can be found liable for defamation, the intentional interference with contractual relations count is not actionable."); *Ellis v. Time, Inc.,* 1997 WL 863267, *36 (D.D.C.1997) (if plaintiff cannot prevail on a defamation claim for statements made by the news media defendant, he cannot rely on the statements to support an intentional interference with business relationships claim because there is no basis for finding that the statements were "improper" as required in such a claim); *Beverly Hills Foodland, Inc. v. United Food and Commercial Workers Union, Local 655,* 39 F.3d 191, 196 (8th Cir.1994) (noting that the constitutional requirements for defamation "must be equally met for a tortious interference claim based on the same conduct or statements," a result that is "only logical as a plaintiff may not avoid the protection afforded by the Constitution ... merely by the use of creative pleading"). This Court has already concluded that Defendants' *Rush to Read* broadcast involved an issue of "undeniable public concern." *Medical Laboratory,* 931 F.Supp. at 1491.[11] Thus, in order for Plaintiffs to pre-

---

treatment of animals was "not 'highly offensive to a reasonable person' because of the nonintrusive nature of the taping process, the context in which the taping took place, and [defendant's] well-intentioned (and in the eyes of some, at least, laudable) motive").

**10.** Unlike the cause of action of intrusion, which was allegedly complete before the publication, the claim of interference with contractual relations and prospective economic relations was inextricably intertwined with the publication.

**11.** The Supreme Court held that "[Whether] ... speech addresses a matter of public concern must be determined by [the expression's] content, form, and context ... as revealed by the whole record." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 761, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985). Information about a medical issue with potential life and death consequences affecting millions of women is plainly an issue of public concern. *Unelko,* 912 F.2d at 1056 (upholding the district court's grant of summary judgment in favor of the defendants and concluding that a news commentator's criticism of a product designed to improve windshield visibility was a matter of public concern because the statement at issue "was of general

vail on their intentional interference with business relationships claim, they must meet the First Amendment's requirements for defamation actions.

When a "private figure" brings a defamation claim against a media defendant for statements involving a matter of public concern, the First Amendment requires that the plaintiff first prove that the statements were false. *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 776, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986). The Supreme Court has held that a plaintiff faced with the burden of showing falsity cannot rely merely on a "slight inaccuracy in the details" of the allegedly libelous statement:

> Minor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.' Put another way, the statement is not considered false unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'

*Masson v. New Yorker,* 501 U.S. 496, 516, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991) (citations omitted). While Plaintiffs bear the burden of proving falsity, Defendants can offer the defense of "substantial truth." *Masson,* 501 U.S. at 516, 111 S.Ct. 2419 (noting that "[t]he essence of the inquiry [into falsity] remains the same whether the burden rests upon plaintiff or defendant"). In *Currier v. Western Newspapers, Inc.,* 175 Ariz. 290, 855 P.2d 1351, 1354 (Ariz.1993), the Arizona Supreme Court held:

> the defense of substantial truth recognizes that 'slight inaccuracies of expression are immaterial' if the alleged defamatory statement is 'true in substance.' A technically false statement may nonetheless be considered substantially true if, viewed 'through the eyes of the average reader,' it differs from the truth only in 'insignificant details.'

(citations omitted); *see also, Read v. Phoenix Newspapers,* Inc., 169 Ariz. 353, 819 P.2d 939, 941 (Ariz.1991) ("Substantial truth is an absolute defense to a defamation action in Arizona.").

If Plaintiffs succeed in proving falsity, they must then demonstrate that the media

defendants acted with the requisite degree of fault in making the allegedly defamatory statements. *Hepps,* 475 U.S. at 778, 106 S.Ct. 1558 ("To provide 'breathing space' for true speech on matters of public concern, the Court has been willing to insulate even demonstrably false speech from liability, and has imposed additional requirements of fault upon the plaintiff in a suit for defamation."); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). The Supreme Court of the United States has accorded some deference to the states in determining the appropriate degree of fault required for a defamation claim. *Gertz,* 418 U.S. at 347, 94 S.Ct. 2997. "[S]o long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." *Id.; Antwerp Diamond Exchange of Am., Inc. v. Better Bus. Bureau of Maricopa County, Inc.,* 130 Ariz. 523, 637 P.2d 733, 737 (Ariz.1981). In Arizona, the general rule is that private figure plaintiffs bringing defamation actions regarding issues of public concern must establish the defendant was negligent. *Dombey v. Phoenix Newspapers, Inc.,* 150 Ariz. 476, 724 P.2d 562 (Ariz.1986). However, when a plaintiff seeks to bring an intentional interference with business relationships claim based on allegedly defamatory statements, because the cause of action is an intentional tort, he may be required to show more than mere negligence. In *Antwerp,* the Arizona Supreme Court considered claims of defamation and intentional interference with business relationships based on an allegedly defamatory report about the plaintiff published by the Better Business Bureau. 637 P.2d 733. Without engaging in exhaustive analysis, the Arizona Supreme Court suggested that to prevail on an intentional interference with business relationships claim based on protected speech, the plaintiff was required to establish defamation as well as *intentional* conduct. *Id.* at 740. The court reasoned, "the tort [of intentional interference with business relationships] requires specific intent. Assuming the statements

interest and was made available to the general public.")

were defamatory, whether they were intentionally so and for the purpose of interfering with the business relationships [at issue] is a fact for the finder of fact to determine." *Id.* Although bereft of explanation for this conclusion, *Antwerp* appears to hold that a plaintiff seeking to bring a claim of intentional interference with business relationships based on protected speech must establish that the statements in question were made with the *specific purpose* of interfering with the plaintiff's business relationships. Several years after *Antwerp*, however, the Arizona Supreme Court suggested that an intentional interference with business relationships claim might not require a plaintiff to establish that the defendant acted with specific intent. The court held that reckless conduct might be enough, noting that the plaintiff had met its burden if the defendant "should have known with substantial certainty" that the plaintiff's business relationships would be harmed as "a necessary consequence" of its conduct. *Snow v. Western Sav. & Loan Ass'n*, 152 Ariz. 27, 730 P.2d 204, 212 (Ariz.1986). The court also made clear, however, that the "interference must still be *'wrongful* by some measure beyond the fact of interference itself.'" *Id.* (citation omitted).

■ The Court need not decide the issue of the appropriate level of fault because Plaintiffs have failed to establish that Defendants' broadcast was false. Without a showing of falsity, Plaintiffs cannot prevail on an intentional interference with business relationships claim which is based on protected speech.[12]

### B. Plaintiff's Failure to Establish Falsity

#### 1. Medical Lab's Performance on the Four "Unmistakable" Slides

Plaintiffs cite several statements from the broadcast which are claimed to be substantially untrue. The first involves four slides that were sent to Medical Lab for pap smear

testing. The broadcast published the following:

> Diane Sawyer: So how did [Medical Lab] do on our slides? Well, on Dr. Bowen's [sic] slides, this lab missed two of the four Dr. Bowen [sic] had called 'unmistakable,' both clear-cut cancer.
>
> Dr. Matilda Bowen[sic]: Absolutely should have been picked up, yes.
>
> Diane Sawyer: That any responsible laboratory should have picked these four up
>
> Dr. Matilda Bowen[sic]: Yes.

(Tr. of *Rush to Read* at 7, attached to PSOF as Exh. 6.) According to Plaintiffs, Medical Lab did not misread one of the two slides that the broadcast reported Medical Lab erroneously found to be normal. Instead, Medical Lab concluded that the sample was "unsatisfactory," meaning that it was difficult to read, and the lab therefore failed to indicate any conclusion regarding whether or not the slide contained abnormal cells. In support, Plaintiffs cite the deposition testimony of Dr. Santos–Buch, an expert used by Defendants to review the slides analyzed by the laboratories profiled in the broadcast. Plaintiffs claim that when asked if Medical Lab's notation that the slide was unsatisfactory due to obscuring red blood cells was a misread, Dr. Santos–Buch "testified flatly, 'That is not a misread.'" (Pls.['] Opp'n to Defs.['] Mot. for Partial Summ.J. on Pls.['] Third Claim for Relief at 9.) However, the full transcript does not support Plaintiffs' interpretation of Dr. Santos–Buch's testimony. The doctor acknowledged that the slide included blood cells "that were obscured either by blood or inflammation." (Santos–Buch Dep. at 22, attached to Defs.['] Reply in Supp. of Defs.['] Mot. for Partial Summ.J. on Pls.['] Third Claim as Exh. B.) When asked if Medical Lab's reading of the slide was a "misread," Dr. Santos–Buch stated "That's not a misread. I mean, it's an interpretation. That, the number of red blood cells is obscuring the samples so they cannot be read. That should raise a red flag to the physician."

---

12. If Plaintiffs had met their burden of establishing falsity, summary judgment would not be appropriate, because Plaintiffs have offered admissible evidence indicating that Defendants may have told Mr. Devaraj that they wanted to "[s]hut them down." (Pls.['] Resp. to Defs.['] First Set of Interrogs., No. 1, attached to PSOF as Exh. 4.) This evidence would be sufficient to raise a genuine issue of material fact on the question of fault even under the specific intent standard of *Antwerp*. 637 P.2d at 740.

(*Id.* at 75.) Significantly, later in the deposition, Dr. Santos–Buch concluded:

Q: [D]id you remember that each of the ABC slides that you reviewed that afternoon you found to be abnormal?

A: Yes, I remember quite clearly because one of the things that one does when you test pathologists is to include normals. And I don't remember a normal slide that day.

Q: Was there any hesitancy in your opinion that day, each of these four slides you reviewed was indeed abnormal?

A: That's correct. *It was quite evident all four were abnormal.*

(*Id.* at 102.) (emphasis added). The notes on which Plaintiffs rely that were taken by a colleague of Dr. Santos–Buch who was present when Dr. Santos–Buch was reviewing the slide in question are similar. While reporting that the doctor found "alot[sic] of blood" and that the sample was "limited for interpretation," they also reveal that he concluded that there was "no question there is an abnormality here." (Notes by Ken Shapinski, attached to Pls.['] Additional Supplemental Local Rule 1.10(1) Statement of Facts in Opp'n to Defs['] Mot. for Summ.J. as Exh. 47.) The broadcast reported that Medical Lab "missed" the finding that the slide was abnormal. (Tr. of *Rush to Read* at 7, attached to PSOF as Exh. 6.) It did so based on the unequivocal conclusion of an expert who found that the sample included "unmistakable" abnormal cells. *Id.* Even if the expert was unreliable, as Plaintiffs claim, the expert on whom Plaintiffs rely found there was "no question there is an abnormality." (Notes by Ken Shapinski, attached to Pls.['] Additional Supplemental Local Rule 1.10(1) Statement of Facts in Opp'n to Defs['] Mot. for Summ.J. as Exh. 47.) Thus, Plaintiffs have failed to establish that the broadcast was not substantially true on this issue. See also March 31, 1998 Order (Dr. Santos–Buch's testimony not adequate basis for false light claim.).

### 2. The Lost Slides

In addition to the four "unmistakable" abnormals mentioned above, which were culled from 100 slides given to Defendants by one of their experts, they also collected 523 pap smear slides from gynecologists who agreed to participate in the program by taking two pap smears from each patient and sending one to the doctor's regular medical laboratory and the other to *Prime Time Live* to be tested by the four laboratories profiled on *Rush to Read*. (Tr. of *Rush to Read* at 6, attached to PSOF as Exh. 6.) Of these 523, *Prime Time Live* identified 19 "clear-cut precancerous abnormal slides" based on the conclusions of the experts relied on by ABC and a computer screening device known as PapNet. (*Id.*) The broadcast claimed that Medical Lab was responsible for missing three of these abnormal slides. (*Id.* at 7.) At some point prior to the broadcast, fifteen of the nineteen slides, including the three Medical Lab slides, were lost by the Defendants.

Plaintiffs claim that the loss of the slides made it impossible for Medical Lab to examine the three slides they purportedly missed, which precluded challenging ABC's reading of them. They rely on Defendants' experts' testimony that "from a scientific perspective...it's best if you can retain all of the subject matter of any study." (Mango Dep. at 228, attached to PSOF as Exh. 21.) Plaintiffs further cite ABC staff members' "concern" that the missing slides were lost, attempting to argue that Defendants' distress regarding the loss evidenced an awareness that the experiment was fatally flawed or subject to legal liability.

The loss of the slides was regrettable and may have been negligent. However, as Defendants note, Plaintiffs were not without means to challenge the validity of the conclusion that the slides were abnormal. Plaintiffs could have reviewed the PapNet data preserved on the computer. If the PapNet data was deemed inadequate, Plaintiffs could have deposed the two experts who read the slides but Plaintiffs chose not to do so. Plaintiffs bear the burden of showing falsity. If the evidence had indicated Defendants' conduct was in bad faith and that they had denied Plaintiffs all means to challenge the Defendants' conclusion, the Court might have been persuaded to exercise its discretion to allow a jury to draw an adverse inference from the loss of the slides. *Unigard Sec. Ins. v. Lakewood Engineering & Mfg.*, 982 F.2d 363, 369 (9th Cir.1992) (district court had discretion to exclude plaintiff's evidence on the grounds that plaintiff "has destroyed

*all reliable evidence* " on the issue in question) (emphasis added); *Akiona v. United States*, 938 F.2d 158, 161 (9th Cir.1991) (concluding that the general rule that "a trier of fact may draw an adverse inference from destruction of evidence relevant to a case," was inapplicable under the facts of the case).

### 3. The Broadcast's Statement that Medical Lab Offered 24–Hour Service

Plaintiffs claim that the publication that "[a]ll four labs offered 24–hour service, including the one in Arizona" was untrue. As evidence, they cite the comments made by Mr. Devaraj during the hidden camera interview indicating that Medical Lab's normal turnaround time was three or four days, statements which were not included in the broadcast. (Tr. of 3/18/94 Interview at 12, attached to PSOF as Exh. 7.) In addition, Plaintiffs point out that Medical Lab did not actually finish ABC's slides in 24 hours. However, the broadcast does not assert that Medical Lab *always* offered a 24 hour turnaround time. Furthermore, a letter that the fictitious Huron Women's Health Collective sent to Mr. Devaraj regarding Medical Lab's agreement to read the slides states: "To confirm our agreements: you have promised a 24 hour turn-around on the slides." (Letter from Charleston to Devaraj of 3/17/94, attached to PSOF as Exh. 2.) Mr. Devaraj admitted that this letter constituted an "agreement" Medical Lab had with the fictitious clinic. (Devaraj Dep. at 105, attached to Defs.['] Reply in Supp. of Defs['] Mot. for Summ.J. on Pls.['] Third Claim.) Given this admission, there is no basis for Plaintiffs' assertion that the broadcast was false on this issue.

### 4. Statements Attributed to Mr. Devaraj

The broadcast published that, when told of the ABC experiment, Mr. Devaraj commented that "if mistakes were made it was an unusual circumstance, and he vowed not to take on such a large case load again." (Tr. of *Rush to Read* at 7, attached to PSOF as Exh. 6.) Plaintiffs claim that the first part of the statement—"if mistakes were made it

was an unusual circumstance"—implied that Mr. Devaraj conceded that Medical Lab made mistakes, which Plaintiffs' deny. Plaintiffs further claim that the second part of the statement was also false, asserting that while Mr. Devaraj had told ABC that "he would never do *this* again," (emphasis added)

> What I meant by that statement was that I would *never again agree to read a large number of slides* over a short period of time for an out of state company that called out of the blue saying that they had heard from an unidentified source that we were a quality lab, pleading that they were backed up in reading slides due to bad weather in their city, and that if we could *help them out of this pinch this one time* then they would be willing to send us large shipments of slides on a monthly basis.

(Devaraj Decl. at ¶ 5, attached to PSOF as Exh. 8.) (emphasis added)

The Defendants did not claim to be quoting Mr. Devaraj directly but were clearly paraphrasing his comments. Mr. Devaraj does not deny that he said the first part of the statement, he argues that the broadcast should have included other statements he made expressing his objection to their conclusions. However, Plaintiffs do not argue that Medical Lab's error rate was zero, acknowledging that Medical Lab does make some mistakes. Thus, it is impossible to see how the broadcast's statement that "if mistakes were made, it was an unusual circumstance," is either false or defamatory. If anything, the statement is *favorable* to Medical Lab. If mistakes were an unusual occurrence at Medical Lab, its error rate might be consistent with the five percent error rate cited by the broadcast as commendable.[13] Thus, the first part of the challenged statement is neither false nor injurious to Medical Lab's reputation.[14]

Regarding the second part of the statement, Plaintiffs admit that Mr. Devaraj's statement—that "he would never do this again" is "open [to] interpretation." (Pls.['] Opp'n to Defs.['] Mot. for Partial Summ.J. on

---

**13.** *See* discussion *infra* page 1197.

**14.** Plaintiffs implicitly concede this by claiming that the statement "cast plaintiffs in an extremely

false light'' rather than arguing that the statement is defamatory. (Pl[s]' Opp. to Def[s]' Motion for Partial Summ.J. on Pl[s]' Third Claim for Relief at 13.)

Pls.['] Third Claim for Relief at 14.) Plaintiffs simply disagree with Defendants' explanation of the meaning of the statement. (*Id.*) The Supreme Court has held that reasonable interpretations of ambiguous information constitute protected speech, even if the interpretations are proven incorrect. *Masson,* 501 U.S. at 497, 111 S.Ct. 2419. According to the Supreme Court, "[t]he protection for rational interpretation serves First Amendment principle by allowing an author the interpretive license that is necessary when relying upon ambiguous sources." *Id.; see also, Time, Inc. v. Pape,* 401 U.S. 279, 290, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971) (noting that magazine's statement "amounted to the adoption of one of several rational interpretations of a document bristling with ambiguities," and concluding that "the deliberate choice of such an interpretation, though arguably reflecting a misconception, was not enough to create a jury issue" regarding whether the magazine knew the information was false or recklessly disregarded the possibility that it might be). Mr. Devaraj's own explanation of his statement that "he would never do this again," begins with the comment that: "*[w]hat I meant by that statement* was that I would never again agree to read a *large number of slides* over a short period of time for an out of state company." (Devaraj Decl. at ¶ 5, attached to PSOF as Exh. 8.) (emphasis added). While Mr. Devaraj adds qualifications regarding the meaning of his statement, they hardly render the broadcast's paraphrase of his statement irrational and therefore substantially untrue. Plaintiffs have failed to establish that the broadcast's characterization of Mr. Devaraj's comments were false.

### 5. The Broadcast's Report on Error Rates in the Industry

■ In the broadcast, it was stated: "Experts say with human fallibility, everyone makes mistakes, but labs should strive to miss no more than five percent of the slides that are abnormal." (Tr. of *Rush to Read* at 6, attached to PSOF as Exh. 6.) Plaintiffs claim that the actual error rate in the industry is considerably higher than five percent and that the program's failure to include this information rendered the statement substantially false. It is apparent from the record that estimates of the national error rate for pap smear laboratories vary considerably and that some of the estimates are higher than five percent. (Santos–Buch Dep. at 16, attached to Defs.['] Mot. for Partial Summ.J. on Pls.['] Third Claim for Relief as Exh. B; Interview with Mango and Ruttenberg at 3, 4, 7, attached to PSOF as Exh. 15.). However, Dr. Santos–Buch, whose own lab has a zero to three percent error rate, stated: "I think you should strive for a zero negative rate, but a five percent is—if you go by our numbers was probably a pretty good goal to strive for." (Santos–Buch Dep. at 16, attached to Defs.['] Mot. for Partial Summ.J. on Pls.['] Third Claim for Relief as Exh. B.) Moreover, the broadcast's statement does not purport to cite the actual error rate within the industry, it is merely aspirational, stating that "labs should *strive* to miss no more than 5%" of abnormal slides. (Tr. of *Rush to Read* at 6, attached to PSOF as Exh. 6.) (emphasis added). The decision of whether to include additional information about the rate of error in the industry was an editorial decision protected by the First Amendment. *See Miami Herald Publ'g Co. v. Tornillo,* 418 U.S. 241, 258, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974) (noting that decisions regarding content and "treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment," and "[i]t has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with the First Amendment.") Thus, Plaintiffs have failed to establish that the alleged inaccuracies rendered the broadcast false.[15] Accordingly, Defendants' motion for sum-

---

**15.** The Court has refused to allow Plaintiffs to amend their complaint to allow an additional claim of fraud based on the transaction between Plaintiffs and the fictitious Huron Women's Health Collective to read the test pap smears. (Order, March 31, 1998.) In addition, on October 5, 1998, Plaintiffs filed a Supplemental Opposition to Defendants['] Motion for Summary Judgment on Plaintiffs' Third Claim for Relief.

In the pleading, Plaintiffs allege additional statements made in the broadcast which they claim were knowingly false. However, Plaintiffs' brief was filed three weeks after the Court's deadline for responses to Defendants' summary judgment motion, which was filed on June 30, 1998. The Court is not persuaded by Plaintiffs' arguments

mary judgment on Plaintiffs' claim of intentional interference with contractual relations must be granted.

### III. Fraud

Plaintiffs claim that Defendants' investigation in preparation for the broadcast constitutes fraud.[16] The only alleged fraud at issue relates to the March 18, 1994 hidden camera interview at Medical Lab during which Ms. Gordon and Mr. Cooke falsely maintained that they were in the laboratory business. Defendants have moved for summary judgment on this claim and Plaintiffs have moved for partial summary judgment only on the issue of liability.

### A. Defendants' Motion for Summary Judgment

■ In order to prevail on a fraud claim in Arizona, a plaintiff must show:

1) a representation; 2) its falsity; 3) its materiality; 4) the speaker's knowledge of the representation's falsity or ignorance of its truth; 5) the speaker's intent that it be acted upon by the recipient in the manner reasonably contemplated; 6) the hearer's ignorance of its falsity; 7) the hearer's reliance on its truth; 8) the right to rely on it; and 9) his consequent and proximate injury.

*Echols v. Beauty Built Homes, Inc.*, 132 Ariz. 498, 647 P.2d 629, 631 (Ariz.1982). For purpose of their motion for summary judgment on Plaintiffs' fraud claim, Defendants assume the first eight elements of fraud. They base their motion on the final element, that damages in a fraud action must have been proximately caused by the alleged wrongful conduct. According to the Restatement, a plaintiff's reliance on an allegedly fraudulent misrepresentation subjects a de-

fendant to liability if the plaintiff justifiably relies on the misrepresentation and "if his reliance is a substantial factor in determining the course of conduct that results in his loss." *Rest.* § 546. Arizona law follows the Restatement, holding that it "must be proved 'with a good deal of certainty' that any [damages] were the direct and proximate result of the fraud." *Bechtel v. Liberty Nat. Bank,* 534 F.2d 1335, 1342–43 (9th Cir.1976) (relying on Arizona law and quoting *Zeller v. Bogue Elec. Mfg. Corp.*, 476 F.2d 795, 803 (2d Cir.1973)).[17]

■ The fraud damages claimed include the loss of business from several physicians, the inability to generate new business, damages for emotional distress, doctors' bills from alleged physical and psychological injuries, and alleged uncompensated labor costs relating to the testing of the Huron Women's Health Collective slides, a project that Plaintiffs claim they would not have undertaken if it were not for their belief that the fictitious clinic would have been a repeat customer. A substantial portion of these damages stem from the broadcast's alleged negative portrayal of Medical Lab. However, the most damaging portion of the broadcast resulted, not from the hidden camera interview on March 18, 1994, but from Medical Lab's own performance on the slides submitted by the fictitious Huron Women's Health Collective. Because that aspect of the alleged fraud is not at issue, any damages flowing from the broadcast's portrayal of the results of those slides must be disregarded. *See supra* note 15. In addition, any embarrassing or otherwise damaging statements made by Mr. Devaraj that were recorded during the March 18, 1994 interview and published were statements he made himself. A federal district court recently considered whether the Food

---

regarding why the deadline should not be respected.

**16.** On October 13, 1998, Plaintiffs filed a Motion for an Order Granting Leave to File a Second Amended Complaint to Add Claims for Defamation & False Light to Conform to Proof. This is the third untimely attempt by Plaintiffs to file an amended complaint. The Court has rejected both previous efforts and has warned Plaintiffs that their time for adding new claims in this case, which was filed over three years ago, has long passed. The decision whether to grant leave to amend under Fed.R.Civ.P. 15(a) is with-

in the sound discretion of the trial court. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Plaintiffs have offered no compelling reason for the Court to rule in their favor and their motion will again be denied.

**17.** Although the doctrine of proximate cause varies in each state, Arizona has adopted the generally accepted principle requiring proof that the wrongful act be a substantial factor in producing the indirect damage. Carolyn K. Foley & David A. Schultz, *Damage Considerations When the Press Is Sued for Gathering the News,* 522 Practicing L. Inst., 129, 154 (1998).

Lion grocery store could recover for damages related to the publication of *Prime Time Live*'s undercover investigation of the store's food handling practices, which reporters captured on hidden camera. Applying the substantial factor test, the court concluded that Food Lion had failed to establish that the lost profits and lost sales claimed as injuries were proximately caused by the alleged fraud of the undercover operation. The court reasoned:

> Food Lion's lost sales and profits were the direct result of diminished consumer confidence in the store. While these losses occurred after the *Prime Time Live* broadcast, the broadcast merely provided a forum for the public to learn of activities which had taken place in Food Lion stores. Stated another way, tortious activities may have enabled access to store areas in which the public was not allowed and the consequent opportunity to film people, equipment and events from a perspective not available to the ordinary shopper, but it was the food handling practices themselves—not the method by which they were recorded—which caused the loss of consumer confidence. Those practices were *not the probable consequence of Defendants' fraud and trespass* and it cannot be argued under the evidence in this case that the filming of those practices by the *Prime Time Live* producers set any of those activities in motion.

*Food Lion, Inc. v. Capital Cities/ABC, Inc.,* 964 F.Supp. 956, 962–63 (M.D.N.C.1997) (emphasis added); *see also, Frome v. Renner,* 26 Media L.Rep.1957, 1958 (Oct. 1, 1997) (defendant's undercover visit to plaintiff physician, which defendant later disparaged on a news program did not proximately cause plaintiff's lost profits, because the program "merely served as a forum through which the public could learn about [p]laintiff's medical practices").[18] Because any negative portrayal of Plaintiffs during the broadcast was not proximately caused by Defendants' misrepresentation of their identities at the March 18, 1994 meeting, Defendants are entitled to summary judgment on this portion of the fraud claim.[19]

---

**18.** In *Food Lion* and *Frome v. Renner,* the courts assumed the truth of the broadcast because the plaintiffs failed to bring a defamation or libel claim. *Food Lion,* 964 F.Supp. at 959 ("For purposes of this opinion and this case, it is assumed that the content of the *Prime Time Live* broadcast about Food Lion was true. Food Lion did not challenge the content of the broadcast by bringing a libel suit. Instead, Food Lion attacked the methods used...to gather the information."); *Frome,* 26 Media L.Rep. at 1958. Here, Plaintiffs have failed to establish that the broadcast was false. Moreover, the Court denied Plaintiffs' request to add a false light claim and Plaintiffs have voluntarily dismissed their defamation claim, though they now seek to amend their complaint to add both claims. As stated earlier, Plaintiffs' motion for an order granting leave to amend their complaint will be denied. Because Plaintiffs have failed to establish that the broadcast was false, the Court need not reach the issue of whether Plaintiffs' voluntary dismissal of the defamation claim permits the Court to assume the truth of the broadcast.

**19.** Defendants alternatively argue that summary judgment on Plaintiffs' fraud claim should be granted on constitutional grounds. The First Amendment protects the media in its collection and dissemination of information regarding matters of public interest. *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The Supreme Court has held that a plaintiff cannot recover damages stemming from the publication of protected speech without first meeting the requirements imposed by the First Amendment for defamation claims. *Hustler Magazine v. Falwell,* 485 U.S. 46, 57, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) (holding that when a claim for defamation fails because a defendant's speech is constitutionally protected, a claim for intentional infliction of emotional express "cannot, consistently with the First Amendment, form a basis for the award of damages."); *Unelko,* 912 F.2d at 1058 (trade libel and tortious interference with business relationship claims are governed by the First Amendment). Under this theory, Plaintiffs would be barred from recovering consequential damages from the fraud, that is the broadcast, unless they could demonstrate that the broadcast was false and that Defendants were at least negligent regarding the alleged inaccuracies, which Plaintiffs have failed to do. *Gertz,* 418 U.S at 323, 94 S.Ct. 2997 (liability for defamation cannot constitutionally be imposed against a media defendant without proof of requisite fault); *Hepps,* 475 U.S. at 778, 106 S.Ct. 1558 ("private figure" plaintiff in matter of public concern must prove falsity). *Compare Cohen,* 501 U.S. at 669, 111 S.Ct. 2513, where the Supreme Court embraced the "well established line of decisions holding that generally applicable laws do not offend the First Amendment simply because their enforcement against the press has *incidental* effects on its ability to gather and report the news." (emphasis added).

The Court declines to rely on this theory for two reasons. First, if a case can be decided on either constitutional or non-constitutional grounds, it should be resolved without reaching the constitutional issue. *Hagans v. Lavine,* 415

Plaintiffs' inability to recover publication damages, which *Food Lion* defines as "losses and expenditures associated with events leading up to and the eventual broadcast" of the news program, eliminates the possibility of compensation for most of Plaintiffs' alleged injuries. 951 F.Supp. at 1219. Plaintiffs cannot recover lost profits and damages based on Medical Lab's inability to generate new business in the future, because the eight physicians whose business Plaintiffs claim to have lost testified that they terminated their business relationship with Medical Lab because of the broadcast or for reasons unrelated to the hidden camera interview of March 18, 1994. (Initial Report of G. Christopher Davis, attached to Defs.['] Statement of Facts in Supp. of Defs.['] Mot. for Partial Summ.J. on Pls.['] Second Claim for Relief ("DSOF for Fraud") as Exh. D; Supplemental Report of Davis, attached to DSOF for Fraud as Exh. F; White Dep. at 6, attached to Defs.['] Mot. for Partial Summ.J. on Pls.['] Second Claim for Relief as Exh. A; Liebmann Dep. at 6, attached to Defs.['] Mot. for Partial Summ.J. on Pls.['] Second Claim for Relief as Exh. B; Stephen Dep. at 6–7, attached to Defs.['] Mot. for Partial Summ.J. on Pls.['] Second Claim for Relief as Exh. C; Stamps Dep. at 71–73, attached to DSOF for Fraud as Exh. G; Fara Dep. at 4–6, attached to DSOF for Fraud as Exh. H; Seligmann Dep. at 9, 10, 21, attached to DSOF for Fraud as Exh. I.) Plaintiffs' own expert based his calculations of lost profits "on the revenue generated by each of the four major doctors that [Plaintiffs] lost as a direct result of the broadcast," and noted that "[i]n fact, with the exception of Dr. Haas, who dropped out several months later, the other three doctors dropped the lab almost immediately following the broadcast." (Letter from G.

Christopher Davis to Brian Rishwain of 8/29/97 at 1, attached to DSOF for Fraud as Exh. F.) Finally, Mr. Devaraj testified that the economic losses he incurred resulted from the broadcast. (Devaraj Dep. at 340–41, 365, attached to DSOF for Fraud as Exh. C.)

▮▮▮ Plaintiffs assert that they are entitled to recover damages for emotional distress allegedly suffered as a result of Defendants' conduct but only pecuniary damages are allowed for fraud under Arizona law. *Echols*, 647 P.2d at 632 ("it is true, as defendants contend, that the Restatement (2d) of Torts contemplates recovery in fraud actions only for pecuniary loss"); *Rest* § 546 ("the maker of a fraudulent misrepresentation" can be "subject to liability for pecuniary loss"); *Id.* at § 525 (someone liable for fraud is subject to liability for "pecuniary loss"); *Id.* at § 549 ("The recipient of a fraudulent misrepresentation is entitled to recover as damages in an action of deceit against the maker the pecuniary loss to him of which the misrepresentation is a legal cause."). Plaintiffs' pecuniary claim amounts to "approximately $3,000 in out of pocket costs for medical treatment and psychological counseling Mr. Devaraj has received as a result of seeing the broadcast and from learning he was so maliciously deceived by Defendants." (Opp. to Defs.['] Mot. for Partial Summ.J. on Pls.['] Second Claim for Relief at 15.) Although Plaintiffs have substantiated this injury with excerpts from Mr. Devaraj's deposition, without reference to specific medical or psychological bills, this is sufficient to create a genuine issue of fact. *Eastman*, 504 U.S. at 458, 112 S.Ct. 2072. Mr. Devaraj corroborated his claims of injury relating to the realization that he had been deceived with testimo-

U.S. 528, 543, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974). Second, it is not yet clear in the Ninth Circuit whether the First Amendment rubric applies to all claims in which damages are based on publication of protected speech or only those causes of action—such as false light or interference with contractual relations—in which the publication is an element of the cause of action. In *Dietemann*, 449 F.2d at 249–50, the Ninth Circuit refused to hold that the constitution shielded news gatherers from tort liability, holding "[t]he First Amendment is not a license to trespass, to steal or to intrude by electronic means into the precincts of another's home or

office. It does not become such a license simply because the person subjected to the intrusion is reasonably suspected of committing a crime." Importantly, the Ninth Circuit did not hold that the cause of action of intrusion was restricted by the application of defamation. If the First Amendment only requires application of the defamation rubric to publication damages for "claims whose gravamen is the alleged injurious falsehood of a statement," *Blatty v. New York Times Co.*, 42 Cal.3d 1033, 1042, 232 Cal.Rptr. 542, 728 P.2d 1177 (1986), causes of action such as trespass and fraud would not be subject to a defamation analysis.

ny from cardiologist Dr. Joanne Ciemo and psychologist Dr. Marlene Joy, whom Mr. Devaraj consulted for heart problems and depression. (Joy Dep. at 47–49, attached to Pls.['] Statement of Facts in Supp. of Mot. for Summ.J. on Pls.['] Second Claim for Relief ("PSOF for Fraud") as Exh. 11; Ciemo Decl. at ¶¶ 3–4, attached to PSOF for Fraud as Exh 14.) Both Drs. Joy and Ciemo stated that Mr. Devaraj's depression and heart problems were caused, not just by the broadcast of *Rush to Read,* but by the deception caused by the March 18, 1994 interview as well. *Id.* Because a question of fact exists regarding whether Defendants' conduct caused Mr. Devaraj pecuniary loss, summary judgment on this portion of Plaintiffs' fraud claim will be denied.

### B. Plaintiffs' Motion for Summary Judgment

■ Plaintiffs have filed a cross motion for summary judgment on the issue of liability on their fraud claim. Because Defendants only assumed the first eight elements of fraud for purpose of their summary judgment motion, Plaintiffs must establish all eight elements of fraud so convincingly that "there can be but one reasonable conclusion as to the verdict." *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505.[20]

One of the elements of a fraud claim is that the hearer of an allegedly fraudulent representation has "the right to rely" on the statement. *Echols,* 647 P.2d at 631. In other words, a plaintiff must show that he was justified in his reliance on the alleged misrepresentation. *Ness v. Western Sec. Life Ins. Co.,* 174 Ariz. 497, 851 P.2d 122, 127 (Ariz.App.1992) (summary judgment granted on fraud claim because plaintiff failed to explain "why [his] reliance [on the alleged misrepresentations] was reasonable"); *Rest.* § 525 (noting requirement of "justifiable reliance"). In this case, Mr. Devaraj invited Ms. Gordon and Mr. Cooke to his office knowing virtually nothing about them. (Devaraj Dep. at 90–92, 241–45 attached to Defs.['] Rule 1.10(i) Statement of Facts in Supp. of Defs.['] Opp. to Pls['] Mot. for Partial Summ.J. on

Second Claim as Exh. A). Plaintiffs took no steps to ensure that Ms. Gordon and Mr. Cooke were legitimate before inviting them to Medical Lab and taking them on a tour of the facility. (*Id.* at 91–92, 241–245.) Mr. Devaraj acknowledged that some of the conduct exhibited by Ms. Gordon and Mr. Cooke during the interview was suspicious. (*Id.* at 83–84, 86, 88.) In his deposition, Mr. Devaraj remembered that "at times, [Ms. Gordon] would excuse herself and say that she dropped something, or she would appear like she wanted to get to places where she wasn't allowed to. That is strong evidence that she was trying to plant some kind of bugging device." (*Id.* at 86.) He also recalled that Ms. Gordon

> picked up some candies. Then she dropped the candies. She picked up the candy that was dropped. Then she removed the candy. Then she was trying to get the wastebasket. Didn't seem like it was something that a normal person would do. Seemed like she had—acted like she was—something that she was looking for or trying to do some kind of a placement.

(*Id.* at 88.) It may be true, as Plaintiffs' claim, that "[a] man who deals with another in a business transaction has a right to rely upon representations of fact as truth." *Byrnes v. Mutual Life Ins. Co. of New York,* 217 F.2d 497, 502 (9th Cir.1954). However, such reliance must still be reasonable, and Mr. Devaraj's testimony creates a fact question regarding whether it was. Thus, Plaintiffs' motion for partial summary judgment on what remains of their fraud claim must be denied.

### IV. Trespass

■ Plaintiffs' fourth claim is for trespass.[21] Trespass is "any unauthorized presence on another's personal property." *State ex rel. Purcell v. Superior Court In and For Maricopa County,* 111 Ariz. 582, 535 P.2d 1299, 1301 (Ariz.1975). If there is authorization for defendant's presence on a plaintiff's private property, there is no trespass. *Rest,* § 892B. However, if the plaintiff "is induced

**20.** Because damages are not at issue in this motion, Plaintiffs only need to establish eight out of the nine elements of fraud.

**21.** This claim is being brought only by Medical Lab because Medical Lab is the sole owner of the property.

to consent by a substantial mistake concerning the nature of the invasion of his interests or the extent of harm to be expected from it and the mistake is known to the other or is induced by the other's misrepresentation, the consent is not effective." *Rest.* § 89213; *Cathemer v. Hunter,* 558 P.2d 975, 978 (Ariz. App.1976).

It is undisputed that Mr. Devaraj invited Ms. Gordon and Mr. Cooke to meet with him at the Medical Lab offices. However, it is also undeniable that Mr. Devaraj would not have given his consent if he had known that Defendants intended to film the interview for broadcast on national television. Thus, the question is whether Defendants' failure to inform Mr. Devaraj of the real purpose of their presence at Medical Lab vitiates the consent given by Mr. Devaraj.

Defendants urge the Court to adopt the reasoning constructed by the Seventh Circuit in *Desnick.* 44 F.3d at 1345. The Seventh Circuit considered several claims brought by the target of an undercover investigation conducted by *Prime Time Live* of an eye clinic operated by the plaintiff. As part of the investigation, reporters posed as patients and filmed their appointments with clinic personnel for the broadcast. The Seventh Circuit noted that journalists are not immune from trespass claims and that consent induced by fraud is generally not given legal effect but observed that there are some instances in which "consent is deemed effective even though it was procured by fraud." *Id.; see also Baugh v. CBS, Inc.,* 828 F.Supp. 745, 756–57 (N.D.Cal.1993) (dismissing trespass claim because entry was based on consent but noting that if consent was fraudulently induced, plaintiff may have a remedy based on fraud). The Seventh Circuit cited examples of situations where fraudulently induced consent would as a matter of sound judgment be deemed valid. The court remarked:

> a restaurant critic could not conceal his identity when he ordered a meal, or a browser pretend to be interested in merchandise that he could not afford to buy. Dinner guests would be trespassers if they were false friends who never would have been invited had the host known their true character, and a consumer who in an effort to bargain down an automobile dealer falsely claimed to be able to buy the same car elsewhere at a lower price would be a trespasser in the dealer's showroom. The fact is that consent to an entry is often given legal effect even though the entrant has intentions that if known to the owner of the property would cause him for perfectly understandable and generally ethical or at least lawful reasons to revoke his consent.

*Desnick.* 44 F.3d at 1351. The court then distinguished situations in which consent gained by misrepresentation is deemed effective from those in which it is not, based on the interests the tort of trespass is designed to protect—ownership or possession of land. *Id.* at 1352–53. This analysis is alluring because the real harm complained of in cases involving surreptitious tape recording by the media has everything to do with an individual's personal revulsion with being deceived and humiliated and nothing to do with harm connected with possession and ownership of property. Generally claims of trespass in these cases appear to be attempts to place a square peg in a round hole. Consequently, trespass cases involving fraudulently induced consent have reached contradictory results, and "the lines [between misrepresentations vitiating consent and those that do not] are not bright—they are not even inevitable." *Id.* at 1352. Given the murky state of the law—particularly in cases involving the uncharted territory of hidden cameras used for newsgathering—and careful consideration of Arizona and Ninth Circuit law on the question of fraudulently induced consent to trespass, the Seventh Circuit's formula for determining whether a plaintiff's interest in ownership or possession of land has been harmed cannot easily be embraced.

First, the Seventh Circuit's analysis does not withstand close scrutiny. The court attempts to distinguish cases reaching different results with factual distinctions—such as whether the invasion occurred in a home—that, while relevant to an intrusion claim, should not affect a trespass analysis based on ownership or possession of land. *Id.* at 1352. Additionally, while the cases upon which the Seventh Circuit relies fit into the court's theoretical framework, they do not all involve trespass claims. *Dietemann,* 449 F.2d at 245 (invasion of privacy action brought against

magazine for undercover tape recording of plaintiff in his home); *Northside Realty Associates, Inc. v. United States,* 605 F.2d 1348, 1355 (5th Cir.1979) (evidence of real estate agency's discriminatory practices collected by testers posing as prospective buyers did not violate the Fourth Amendment); *Haynes v. Alfred Knopf, Inc.,* 8 F.3d 1222, 1229 (7th Cir.1993) (invasion of privacy and libel claims brought against author and publisher of book in which plaintiffs' family was mentioned). The Seventh Circuit may have relied on non-trespass cases for purposes of analogy, which confirms that the rationale is more theory than settled law.

Moreover, the Seventh Circuit does not satisfactorily explain how the cited examples in which fraudulently induced consent is deemed ineffectual differ from those in which consent is found to be valid. If a restaurant owner has the right to refuse the presence of reporters filming her property with visible cameras, *Le Mistral, Inc. v. Columbia Broadcasting System,* 61 A.D.2d 491, 402 N.Y.S.2d 815, (N.Y.A.D./1978), why should the plaintiff be precluded from objecting to filming with invisible ones? The Seventh Circuit would contend that the difference is that in *Le Mistral,* the cameras caused some disruption to the business, while invisible ones did not. But if the underpinnings of a trespass action are interference with ownership and possession of the property, why should that interest not also include the right to prevent the taking of secret and unauthorized images of one's property? *Food Lion,* 951 F.Supp. at 1223 (noting that "[c]ourts have held that the taking of unauthorized images of a person's property at the direction of law enforcement officers can be a seizure sufficient to violate the Fourth Amendment."). Similarly, it is unclear how the ownership and possessory interests of a "homeowner [who] opens his door to a purported meter reader who is in fact nothing of the sort—just a busybody curious about the interior of the home" would be more at risk

than a business owner whose offices were secretly videotaped by a stranger from the media allegedly snooping for matters of public interest. *Desnick,* 44 F.3d at 1352. Yet under the Seventh Circuit's analysis, the busybody would be liable for trespass, while the reporter would not.[22] Finally, if an employee who steals the trade secrets of the employer commits a trespass then it would seem to follow that a sham customer who takes secret pictures of the interior of a business also commits a trespass. *Id.,* citing *Rockwell Graphic Systems, Inc. v. DEV Industries, Inc.,* 925 F.2d 174, 178 (7th Cir.1991).

Finally, the conclusions reached in *Desnick* are not supported by the law in Arizona or the Ninth Circuit. *Id.* While Arizona courts do not appear to have squarely considered the issue of fraudulently induced consent in trespass actions, they have considered the issue in battery claims. The Restatement provides for one principle to be applied uniformly to all tort claims where the defense of consent by misrepresentation is raised. *Rest.* § 892B(2). Section 892B(2) of the Restatement provides:

> If the person consenting to the conduct of another is induced to consent by a substantial mistake concerning the nature of the invasion of his interests or the extent of the harm to be expected from it and the mistake is known to the other or is induced by the other's misrepresentation, the consent is not effective for the unexpected invasion or harm.

The Restatement also discusses mistakes concerning matters which do not affect the level of invasion or harm. It is stated: "The rule stated in Subsection (2) is limited to substantial mistakes, known to the actor, concerning the nature of the invasion or the extent of the harm that is to be expected. If the consent is induced by mistake concerning other matters, the rule does not apply." *Id.* at illus. g. In a battery case involving in-

---

**22.** It is unclear whether the outcome in *Desnick* would have been the same if the videotaping had taken place in a semi-private office, as in the instant case, rather than a public eye clinic. 44 F.3d at 1345. In *Food Lion,* the court distinguished *Desnick* on these grounds, noting that in *Food Lion,* the defendants sought access to "areas of the store not open to the general public"

while in *Desnick,* the camera crew "entered offices that were open to anyone expressing a desire for ophthalmic services." *Food Lion,* 951 F.Supp. at 1222–23; *Desnick,* 44 F.3d at 1348. Because the portion of Medical Lab that Mr. Cooke and Ms. Gordon entered was semi-private, *Desnick* may also be distinguishable on factual grounds. *Desnick,* 44 F.3d at 1345.

formed consent to surgery, the Arizona Court of Appeals based its analysis of the scope and validity of consent on § 892 of the Restatement and Prosser, noting:

> The defendant's privilege is limited to the conduct to which the plaintiff consents, or at least to acts of a substantially similar nature.... Permission to dump 'a few stones' upon property is not a permission to cover it with boulders. If the defendant goes beyond the consent given, and does a substantially different act, he is liable.'

*Cathemer v. Hunter,* 27 Ariz.App. 780, 558 P.2d 975, 978 (Ariz.App.1976), quoting Prosser, *The Law of Torts* § 18, 103–05 (1971); see also, *Shetter v. Rochelle,* 2 Ariz.App. 358, 409 P.2d 74 (Ariz.App.1965) (citing *Rest.* § 892).

In the instant case, Mr. Devaraj, on behalf of Medical Lab, consented to the reporters' presence in the laboratory because, based on their representations to him, he believed they merely wanted to discuss the profession and possible future collaborations. Mr. Devaraj did not consent to any videotaping of his property, an act which is hardly "substantially similar" to a business meeting with supposed colleagues. *Cathemer,* 558 P.2d at 978; see also, *Copeland v. Hubbard Broadcasting Inc.,* 526 N.W.2d 402 (Minn.App. 1995) (consent given to a student to accompany a doctor to plaintiff's home was vitiated by the fact that the student had not revealed that she was secretly videotaping the activities for a news broadcast). The Ninth Circuit considered a similar case involving plaintiffs whose property was searched by federal law enforcement agents. *Berger v. Hanlon,* 129 F.3d 505 (9th Cir.1997), *cert. denied, Berger v. Cable News Network, Inc.,* — U.S. —, 119 S.Ct. 403, 142 L.Ed.2d 327, 1998 WL 396237 (U.S. Nov. 2, 1998), *and cert. granted, Hanlon v. Berger,* — U.S. —, 119 S.Ct. 443, — L.Ed.2d — (1998). Prior to the search, and unbeknownst to the plaintiffs, the government had signed an agreement allowing members of the media to videotape the search. *Id.* at 508. Reversing the district court's conclusion that no trespass had occurred, the Ninth Circuit held that "[a]lthough [the plaintiff] consented to

[the federal agent's] entry into the home, he never consented to the entry of the media-owned microphone that [the federal agent] wore." *Id.* at 517.[23] *Berger,* though relying on Montana law, is on point. In the instant case, Medical Lab, through Mr. Devaraj, may have consented to the presence of Mr. Cooke, but he did not consent to the use of the cameras concealed in Mr. Cooke's wig used to take pictures of the Medical Lab property.

The Court notes, however, that any damages Plaintiffs might otherwise be entitled to are subject to the same causation analysis as the damages in Plaintiffs' fraud claim. *Food Lion,* 964 F.Supp. at 963. Any damages caused by the publication of the videotaped meeting were not proximately caused by the trespass and Plaintiffs do not claim to have incurred any other damages as a result of the trespass. As the Court reasoned in *Food Lion,* "[i]f it can be argued that Defendants should have foreseen the ultimate consequences, the acts of Food Lion employees interrupted any casual connection between Defendants' fraud and trespass so as to render that tortious activity remote from the ultimate loss of profits and sales." *Id.* Moreover, because Plaintiffs' performance on the Huron Women's Collective slides was independent of the trespass, damages stemming from that portion of the broadcast is barred. Thus, Defendants' motion for summary judgment on the claim of trespass will be granted.

## V. Title 18 U.S.C. § 2511

Defendants also move for summary judgment on Plaintiffs' claim that they violated 18 U.S.C. § 2511, the federal eavesdropping statute, when they secretly recorded the March 18, 1994 meeting at Medical Lab. Section 2511(2)(d) provides:

> It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given

---

**23.** In contrast, in *Baugh,* 828 F.Supp. at 756, a district court found a crime victim had consented to the alleged trespass because she consented to

the presence of a camera crew accompanying a police officer into her home.

prior consent to such interception *unless such communication is intercepted for the purpose of committing any criminal or tortious act* in violation of the Constitution or laws of the United States or any State. (emphasis added). Plaintiffs allege that Defendants recorded the March 18, 1994 meeting for the purpose of committing intrusion, fraud, trespass, and tortious interference with contractual and prospective economic relations. However, they offer nothing to support this claim other than a summary of the same arguments for liabilities for the underlying torts. They offer no support for the assertion that Defendants recorded the meeting for the *purpose* of committing a tort, which, as the statute indicates, is the proper focus of inquiry in a § 2511 claim. Even if Defendants were found liable for fraud, the question is not whether they are ultimately liable for conduct found to be tortious, but whether, at the time the recording took place, they recorded the conversation with the express intent of committing a tort.

This distinction is significant, for without it the media could be held liable for undercover reporting under § 2511 even when their sole intent was to gather news. Such a result would appear to be contrary to the legislative intent behind a 1986 amendment to § 2511. *See* Scott Golde, *Media Organizations' Exposure to Liability Under the Federal Wiretapping Act: The Medical Laboratory Management Consultants Case,* 76 Wash.U.L.Q. 431, 435 (1998). That amendment, which was passed largely in response to a case in which a media defendant was held liable under § 2511 for secretly recording an interview, was designed to thwart "attempts by parties to chill the exercise of First Amendment rights through the use of civil remedies" under § 2511. *Id.* at 435–36, citing *Boddie v. American Broadcasting Cos.,* 731 F.2d 333 (6th Cir.1984). As the legislators noted, Congress did not intend for § 2511 to become a "stumbling block in the path of journalists who record their own conversations." *Id.* at 436.

Courts considering § 2511 claims against media defendants have agreed, failing to hold media defendants liable under § 2511 even when the defendants may ultimately be held liable for other tortious conduct. In *Russell,* 1995 WL 330920 at *4, the court considered a

similar case of an undercover report conducted by *Prime Time Live* and observed that "the critical question under section 2511(2)(d) is why the communication was intercepted, not how the recording was ultimately used." Finding that the defendants' intent was "to expose sanitation problems in the commercial fish industry," the court held that [t]herefore, "it is clear that defendants did not intercept and record plaintiff's conversations for the purpose of committing a crime or tort." *Id.* The Seventh Circuit has similarly recognized that the proper inquiry is not whether a defendant ultimately committed a tort, but whether she made the recording with the specific purpose of committing a tort. *Desnick,* 44 F.3d at 1353. Though the Seventh Circuit reversed a grant of summary judgment on a defamation claim, it affirmed the lower court's dismissal of the § 2511(2)(d) claim, concluding:

> Maybe the program as it was eventually broadcast was tortious, for we have said that the defamation count was dismissed prematurely. But there is no suggestion that the defendants sent the testers into the Wisconsin and Illinois offices for the purposes of defaming the plaintiffs by charging tampering with the glare machine.

*Id.* Finally, in a decision that was affirmed by the Ninth Circuit, a Montana district court refused to hold Cable News Network ("CNN") liable for secretly filming an investigative search of plaintiffs' property conducted by law enforcement agents who had consented to CNN's presence. *Berger v. Cable News Network, Inc.,* 1996 WL 390528 (D.Mont.), *aff'd, Berger,* 129 F.3d at 516. The district court reached this conclusion "because [it did] not find that defendants made the recordings for the purpose of committing a crime or tortious act. Instead, the recordings were made for the purpose of producing a news story and for the defendants' commercial gain." *Berger,* 1996 WL 390528 at *3; *aff'd, Berger* 129 F.3d at 516 ("we hold the media appellees not liable under the Federal Wiretap Act"); *see also Deteresa,* 121 F.3d at 467 (upholding summary judgment on an eavesdropping claim on the grounds that the plaintiff had failed to establish that the defendants had taped the con-

versation at issue "for the specific purpose" of committing the torts alleged).

Plaintiffs have offered no convincing evidence or arguments explaining why Defendants would have any reason to record the meeting with Mr. Devaraj other than to gain information and video footage for their broadcast. Thus, they cannot prevail on their § 2511 claim. Accordingly, Defendants' motion to dismiss Plaintiffs' § 2511(2)(d) claim will be granted.

## VI. Attorney–Client Privileged Documents

■ On November 4, 1998, the Court denied Plaintiffs' request that the Court compel Defendants to produce attorney-client privileged documents on the basis of the crime-fraud exception to the attorney-client privilege. In the Order, the Court noted that an opinion containing findings of fact and conclusions of law would follow. This is that opinion.

The Supreme Court has observed that "[t]he attorney-client privilege is the oldest of the privileges for confidential communications known to the common law. Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). However, "it is well settled that the attorney client privilege does not extend to attorney-client communications which solicit or offer advice for the commission of a crime or fraud." *In Re Grand Jury Investigation*, 974 F.2d 1068, 1071 (9th Cir.1992), quoting *Clark v. United States*, 289 U.S. 1, 15, 53 S.Ct. 465, 77 L.Ed. 993 (1933). Plaintiffs contend that the exception should apply here, arguing that Defendants' consultations with ABC attorneys in preparation for their undercover operation at Medical Lab constituted communications made in furtherance of a fraud. *Id.*

Where the movant seeks an *in camera* review of documents claimed to be privileged, he must demonstrate "a factual basis adequate to support a good faith belief by a reasonable person ... that an *in camera* review of the materials may reveal evidence to establish that the crime-fraud exception applies." *United States v. Zolin*, 491 U.S. 554, 572, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989). If the moving party succeeds in making that threshold showing, "the decision of whether to engage in *in camera* review rests in the sound discretion of the district court." *Id.* When the moving party seeks actual production of documents, instead of *in camera* review, as is the case here, even stricter requirements apply. *Zolin*, 491 U.S. at 572, 109 S.Ct. 2619 ("a lesser evidentiary showing is needed to trigger *in camera* review than is required ultimately to overcome the privilege."). First, "the challenger must present evidence which, if believed by the jury would establish the elements of [the alleged crime or fraud]." *Laser Industries Ltd. v. Reliant Technologies, Inc.*, 167 F.R.D. 417, 434 (N.D.Cal.1996). Second, the movant must make "a prima facie showing 'that the attorney was retained in order to promote intended or continuing criminal or fraudulent activity.'" *United States v. de la Jara*, 973 F.2d 746, 748 (9th Cir.1992), quoting *United States v. Zolin*, 905 F.2d 1344, 1345 (9th Cir.1990). For the exception to apply, the advice must "be sought for a knowingly unlawful end." 8 Wigmore on Evidence § 2298. Finally, the district court must determine, by a preponderance of the evidence, whether the exception is justified, taking into account "the entire record." *Laser Industries*, 167 F.R.D. at 435–37. A court must exercise "considerable caution when ... pressed during the discovery stage of complex litigation to find that a showing of crime or fraud ... sufficient to justify penetrating a privilege has been made." *Id.* at 436.

Plaintiffs urge the Court to follow the reasoning in *Food Lion*, where the crime-fraud privilege was held to apply to communications between ABC staff attorneys and *Prime Time Live* reporters and producers preparing for their undercover report on the grocery store. (Memorandum Opinion and Order, No. 6:92cv00592 (M.D.N.C., October 1, 1996), attached to Pls.['] Mot. for an Order Compelling Att'y–Client Privileged Docs. Withheld by Defs. to be Produced Based on the Crime–Fraud Exception as Exh. 27.) According to the court in *Food Lion*, "the ABC employees, ... at the very least, should have known that the creation of false identities, false credentials and false letters of

reference for use in the manner in which they were used could amount to fraud or misrepresentations." *Id.* However, as Plaintiffs acknowledge, the law regarding liability for newsgathering activities involving undercover reporting is far from settled. (Opp. to Defs['] Mot. for Partial Summ. J. on Pls['] Second Claim for Relief at 1, noting that "[t]his case has unusual facts, presenting a new kind of fraud.... Because this is a new emerging fraud, few courts have had to grapple with the issue of what damages ... are recoverable."). Therefore, it is not plausible that Defendants "knew or should have known" that they would be liable for fraud. In fact, there is every indication that Defendants, recognizing the uncertainty in the law, sought the advice of staff counsel to assist in designing the undercover operation so that it would conform with the law. (Rosen Dep. at 48, attached to Defs.['] Resp. to Mot. for Order Compelling Att'y–Client Privileged Docs. as Exh. C; Wald Dep. at 78, attached to Defs.['] Resp. to Mot. for Order Compelling Att'y–Client Privileged Docs as Exh. B.) Because Plaintiffs have failed to demonstrate that Defendants' communications with ABC counsel were conducted with the *express purpose* of promoting intended or continuing criminal or fraudulent activity, this Court is not prepared to find as a matter of law that the crime fraud exception applied to the privileged documents. Thus, Plaintiffs' motion to compel production of the documents will be denied.

*VII. Ms. Garcia–Cottrell*

■■■ Defendant Lorri Garcia–Cottrell, who was the secretary to Ms. Gordon when Ms. Gordon was preparing for the March 18, 1994 interview, moves separately for summary judgment on the ground that she was only peripherally involved in the acts that form the basis for this lawsuit. Because the Court has granted summary judgment for all Defendants on all of Plaintiffs' claims except for fraud, the issue is whether Ms. Garcia–Cottrell is entitled to summary judgment on that claim.

Arizona has adopted Section § 876 of the Restatement regarding persons acting in concert which states:

For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he (a) does a tortious act in concert with the other or pursuant to a common design with him; or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself; or (c) gives substantial assistance to the other in accomplishing a breach of duty to the third person.

*See Estate of Hernandez by Hernandez–Wheeler v. Flavio,* 187 Ariz. 506, 930 P.2d 1309, 1314 (Ariz.1997) (relying on *Rest.* § 876).

Plaintiffs cite Ms. Garcia–Cottrell's role in preparing slides for the Huron Women's Health Collective, as well as other activities related to that aspect of the broadcast. However, as Plaintiffs know, the Huron Women's Health Collective forms no part of the fraud action. The fraud which has survived is the March 18, 1994 meeting at Medical Lab. Plaintiffs do not allege that Ms. Garcia–Cottrell ever communicated with Mr. or Ms. Devaraj or any staff members at Medical Lab in preparation for the March 18 meeting. Plaintiffs also do not allege that Ms. Garcia–Cottrell traveled to Phoenix in connection with the March meeting or that she ever attended any meetings in which strategy relating to that meeting was discussed because to do so would contradict Ms. Garcia–Cottrell's own deposition testimony. (Garcia–Cottrell Dep. at 149, attached to PSOF as Exh. 13.) In fact, Ms. Garcia–Cottrell's sole involvement in preparation for the March 18 interview was either informing Mr. Cooke to contact someone at ABC to schedule the Phoenix trip or speaking with someone at ABC to arrange the trip for him.[24] (*Id.*) This assistance hardly constitutes a "substantial factor in causing the resulting tort." *Rest.* § 876 cmt. d. An illustration from the Restatement is instructive:

A is employed by B to carry messages to B's workmen. B directs A to tell B's workmen to tear down a fence that B believes to be on his own land but that in fact, as A knows, is on the land of C. A

---

24. Ms. Garcia–Cottrell apparently does not remember whether she actually spoke with someone at ABC or whether she instructed Mr. Cooke to contact ABC himself. (*Id.*)

delivers the message and the workmen tear down the fence. *Since A was a servant used merely as a means of communication, his assistance is so slight that he is not liable to C.*

§ 876 cmt. b, illus. 9 (emphasis added). Ms. Garcia–Cottrell's conduct is no different from the messenger in the Restatement's example. She merely communicated information related to an administrative matter to a colleague of her supervisor. Therefore, she cannot be held liable for the alleged fraud and her motion for summary judgment will be granted.

## VIII. *Rondi Charleston*

■ Defendant Rondi Charleston also moves for summary judgment on Plaintiffs' claims. As is the case with Ms. Garcia–Cottrell, the relevant inquiry is whether Ms. Charleston is liable for the alleged fraud involving the March 18, 1994 interview at Medical Lab. Plaintiffs allege no direct participation between Ms. Charleston and the March 18, 1994 interview. As Ms. Charleston's deposition reveals, her sole involvement was with the fictitious Huron Women's Health Collective. (Charleston Dep. at 31–33, 40–41, 45–46, 55–63, 77–78, 80, 90–92, 105–6, 109, 199–200, 208–10, 249, 258, 264–266, attached to PSOF as Exh. 1.) Plaintiffs' only link between Ms. Charleston and the March 18, 1994 interview that forms the basis for the remaining claim is that Ms. Charleston arranged with Ms. Gordon that Ms. Charleston send the slides from the Huron Women's Health Collective to Medical Lab on March 18, 1994 so that the hidden camera would be able to capture footage of the Medical Lab staff working on the slides. This footage was to be used in the broadcast. The Court has concluded that damages related to the broadcast were not proximately caused by Defendants' conduct. *Food Lion,* 964 F.Supp. at 963. Thus, to survive a motion for summary judgment by Ms. Charleston, Plaintiffs must establish that her role in sending the slides to Medical Lab on the day of the hidden camera interview was a proximate cause of Mr. Devaraj's distress in learning that he was deceived about the real purpose of the March 18 interview. This they plainly cannot do. If Mr. Devaraj suffered distress at the realization that he had been deceived, it was not caused or exacer-

bated by any conduct of Ms. Charleston. Because no reasonable jury could conclude otherwise, Ms. Charleston's motion for summary judgment will be granted.

## IX. *Punitive Damages*

■ Finally, Defendants move for summary judgment on Plaintiffs' request for punitive damages on each of Plaintiffs' five claims. Under Arizona law, it is clear that "punitive damages are only recoverable under special circumstances." *Rawlings v. Apodaca,* 151 Ariz. 149, 726 P.2d 565, 578 (Ariz.1986). Even in bad faith tort actions, punitive damages are recoverable "when, and only when, the facts establish that defendants' conduct was aggravated, outrageous, malicious or fraudulent.... To obtain punitive damages, plaintiff must ... show that the evil hand that unjustifiably damaged the objectives sought to be reached by the ... [act] was guided by an evil mind." *Id.* According to the Arizona Supreme Court, the imposition of punitive damages is an "extraordinary civil remedy which should be appropriately restricted to only the most egregious of wrongs." *Linthicum v. Nationwide Life Ins. Co.* 150 Ariz. 326, 723 P.2d 675, 680 (Ariz.1986).

Plaintiffs have made no showing that Defendants' conduct warrants such an "extraordinary" remedy. *Id.* Plaintiffs' fraud claim is the only one of Plaintiffs' claims to survive summary judgment. While punitive damages are sometimes appropriate in fraud actions, *Gonzalez v. Gonzalez,* 181 Ariz. 32, 887 P.2d 562, 565 (Ariz.App.1994), a jury could not reasonably conclude that Defendants' hidden camera interview was sufficiently egregious to meet the severe standard required for the imposition of punitive damages in this case. In fact, this Court has previously concluded that Defendants' conduct was not "outrageous." *Medical Laboratory,* 931 F.Supp. at 1494. The Court noted earlier in this litigation:

> Plaintiffs allege that Defendants engaged in outrageous behavior by videotaping Medical Lab and Mr. Devaraj by a hidden camera. In a case involving similar facts, the Seventh Circuit recently affirmed the dismissal of invasion of privacy claims

brought by two employees of a medical office who were videotaped "undercover" by reporters posing as patients. The Court holds that conduct found not to be actionable by a federal court in a like context cannot, as a matter of law, be deemed "outrageous" here.

*Id.* (citing *Desnick,* 44 F.3d at 1353–55). Thus, punitive damages are not warranted and Defendants' motion for summary judgment on the issue will be granted.

Accordingly,

**IT IS ORDERED** that Defendants' Motion for Partial Summary Judgment on Plaintiffs' First Claim for Relief (Intrusion) (Doc. 218) is granted.

**IT IS FURTHER ORDERED** that Defendants' Motion for Partial Summary Judgment on Plaintiffs' Second Claim for Relief (Fraud) (Doc. 201) is granted in part and denied in part.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Partial Summary Judgment on Plaintiffs' Second Claim for Relief (Fraud) (Doc. 216) is denied.

**IT IS FURTHER ORDERED** that Defendants' Motion for Partial Summary Judgment on Plaintiffs' Third Claim for Relief (Interference with Contractual Relations and Prospective Economic Advantage) (Doc. 218) is granted.

**IT IS FURTHER ORDERED** that Defendants' Motion for Partial Summary Judgment on Plaintiffs' Fourth Claim for Relief (Trespass) (Doc. 218) is granted.

**IT IS FURTHER ORDERED** that Defendants' Motion for Partial Summary Judgment on Plaintiffs' Seventh Claim for Relief (18 U.S.C. § 2511) (Doc. 218) is granted.

**IT IS FURTHER ORDERED** that Defendant Lorri Garcia–Cottrell's Motion for Summary Judgment (Doc. 218) is granted.

**IT IS FURTHER ORDERED** that Defendant Rondi Charleston's Motion for Summary Judgment (Doc. 218) is granted.

**IT IS FURTHER ORDERED** that Defendants' Motion for Partial Summary Judgment on Punitive Damages (Doc. 218) is granted.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for an Order Granting Leave to File a Second Amended Complaint to Add Claims for Defamation & False Light to Conform to Proof (Doc. 259) is denied.